No. 22-1482

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, <br><br> Plaintiffs-Appellants, <br><br> v. <br><br> MARC D. SMITH, in his official capacity as Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, <br><br> Defendants-Appellees. | ) Appeal from the United States <br> ) District Court for the Central <br> ) District of Illinois, Springfield Division <br> ) <br> ) <br> ) <br> ) <br> ) No. 3:18-cv-03085-SEM-TSH <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) The Honorable <br> ) SUE E. MYERSCOUGH, <br> ) Judge Presiding. |

**BRIEF OF DEFENDANTS-APPELLEES**

**KWAME RAOUL**
Attorney General
State of Illinois

**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendants-Appellees

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iii

JURISDICTIONAL STATEMENT ................................................................................ 1

ISSUES PRESENTED FOR REVIEW ........................................................................ 2

INTRODUCTION ............................................................................................................ 3

STATEMENT OF THE CASE ........................................................................................ 5

    A.    Regulatory background ............................................................................ 5

    B.    Plaintiffs file suit .................................................................................... 8

    C.    Defendants move for summary judgment .............................................. 9

    D.    Plaintiffs oppose defendants' summary judgment motion .................... 16

    E.    The district court enters summary judgment in favor of
        defendants. .............................................................................................. 16

SUMMARY OF ARGUMENT ...................................................................................... 19

ARGUMENT ................................................................................................................ 21

I.    The Standard Of Review Is *De Novo*. .................................................................. 21

II.    The Second Amendment Allows States To Regulate Firearms In
Sensitive Places And In A Manner Consistent With Text And
Historical Tradition.. .......................................................................................... 22

III.    The District Court Properly Granted Summary Judgment To
Defendants On Plaintiffs' Claim That The Day Care Rule Violated The
Second Amendment.. .......................................................................................... 25

    A.    The Day Care Rule comports with the Second Amendment because
        day care homes are sensitive places. .................................................... 26

    B.    Alternatively, the Day Care Rule is consistent with the historical
        tradition of firearms regulation, and thus does not violate the
        Second Amendment. .............................................................................. 33

IV.    The District Court Properly Granted Summary Judgment To
Defendants On Plaintiffs' Claim That The Foster Rule Violated The
Second Amendment ............................................................................................ 38

i

A.      It is permissible for DCFS, in its capacity as legal guardian, to require its contractors to safely store firearms in foster homes. .......... 38

B.      In any event, the Foster Rule comports with the Second Amendment because foster homes are sensitive places. ....................... 47

C.      In the further alternative, the Foster Rule is consistent with the historical tradition of firearms regulation, and thus does not violate the Second Amendment. ............................................................ 49

V.    In Any Event, The Millers Waived Their Second Amendment Rights. .......... 50

CONCLUSION .......................................................................................................... 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

## Cases

*Alexander v. State,*
    11 S.W. 628 (Tex. App. 1889) ............................................................ 32

*Arnett v. Webster,*
    658 F.3d 742 (7th Cir. 2011) ............................................................ 21

*Bourgeois v. Watson,*
    977 F.3d 620 (7th Cir. 2020) ........................................................... 47

*Burgess v. Lowery,*
    210 F.3d 942 (7th Cir. 2000) ................................................... 41, 44

*Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.,*
    24 F.4th 640 (7th Cir. 2022) ........................................................... 42

*Coleman v. State,*
    32 Ala. 581 (Ala. 1858) .................................................................... 35

*Comsys, Inc. v. Pacetti,*
    893 F.3d 468 (7th Cir. 2018) ........................................................... 40

*Coyne-Delany Co. v. Cap. Dev. Bd. of State of Ill.,*
    616 F.2d 341 (7th Cir. 1980) ........................................................... 40

*Culp v. Raoul,*
    921 F.3d 646, 649 ............................................................................. 22

*D.H. Overmyer Co. Inc., of Ohio v. Frick Co.,*
    405 U.S. 174 (1972) .......................................................................... 50

*Daunt v. Benson,*
    956 F.3d 396 (6th Cir. 2020) ..................................................... 42, 53

*DiGiacinto v. Rector & Visitors of George Mason Univ.,*
    281 Va. 127 (2011) ........................................................................... 27

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................................................... 9, 22

*Domka v. Portage Cnty.,*
    523 F.3d 776 (7th Cir. 2008) ........................................................... 50

*Dupuy v. Samuels,*
   397 F.3d 493 (7th Cir. 2005)................................................................ 40

*Ex Parte Crouse,*
   4 Whart. 9 (Pa. 1839) ....................................................................... 48

*Ezell v. Chicago,*
   846 F.3d 888 (7th Cir. 2017) ............................................................ 37

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011)....................................................17, 26, 37

*Fednav Int'l Ltd. v. Cont'l Ins. Co.,*
   624 F.3d 834 (7th Cir. 2010)............................................................. 31

*First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago,*
   988 F.3d 978 (7th Cir. 2021)............................................................. 39

*Frein v. Pennsylvania State Police,*
   47 F.4th ----, 2022 WL 3724097 (3rd Cir. 2022) .............................. 36

*Friedman v. City of Highland Park,*
   784 F.3d 406 (7th Cir. 2015) ............................................................ 22

*Frost v. Railroad Commission of California,*
   271 U.S. 583 (1926) ....................................................................44, 45

*Fulton v. City of Philadelphia,*
   141 S. Ct. 1868 (2021)...................................................................... 45

*Gamble v. United States,*
   139 S. Ct. 1960 (2019)...................................................................... 37

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) ......................................................................40, 46

*Hall v. Sweet,*
   666 F. App'x 469 (6th Cir. 2016) ..................................................... 53

*Hernandez v. Cook Cnty. Sheriff's Off.,*
   634 F.3d 906 (7th Cir. 2011)............................................................. 21

*Johnson v. Cambridge Indus., Inc.,*
   325 F.3d 892 (7th Cir. 2003)............................................................. 30

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019)...........................................................................37

*Koontz v. St. Johns River Water Mgmt. Dist.,*
    570 U.S. 595 (2013) .............................................................................. 45, 46

*M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.,*
    845 F.3d 313 (7th Cir. 2017)...........................................................................26

*McDonald v. Chicago,*
    561 U.S. 742 (2010) .......................................................................................22

*Medlock v. Trustees of Indiana Univ.,*
    738 F.3d 867 (7th Cir. 2013)..................................................................41, 50, 52

*MMG Fin. Corp. v. Midwest Amusements Park, LLC,*
    630 F.3d 651 (7th Cir. 2011)...........................................................................21

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012)...........................................................................37

*Monfils v. Taylor,*
    165 F.3d 511 (7th Cir. 1998).......................................................................7, 39

*NASA v. Nelson,*
    562 U.S. 134 (2011) .............................................................................. 40, 42

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose,*
    --- F. Supp. 3d ---, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022 .......................36

*Nat'l Rifle Ass'n of Am. v. ATF,*
    700 F.3d 185 (5th Cir. 2012)...........................................................................34

*New York State Rifle & Pistol Assoc., Inc. v. Bruen,*
    142 S. Ct. 2111 (2022)............................................................................. *passim*

*Nordyke v. King,*
    563 F.3d 439(9th Cir. 2009)...........................................................................27

*O'Regan v. Arbitration Forums, Inc.,*
    246 F.3d 975 (7th Cir. 2001)...........................................................................21

*Planned Parenthood of Indiana, Inc. v. Commissioner of Ind. State*
    *Dep't of Health,* 699 F.3d 962 (7th Cir. 2012)................................................41

*Prescott v. State,*
    19 Ohio St. 184 (1869) ...................................................................... 48

*Rainey v. State,*
    8 Tex. App. 62 (1880) ...................................................................... 29

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020) ...................................................................... 37

*Roth v. House of Refuge,*
    31 Md. 329 (1869) ............................................................................ 48

*Santiago v. Walls,*
    599 F.3d 749 (7th Cir. 2010) ............................................................ 21

*Snepp v. United States,*
    444 U.S. 507 (1980) .......................................................................... 42

*Solomon v. Cook Cnty. Bd. of Commissioners,*
    559 F. Supp. 3d 675 (N.D. Ill. 2021) ............................................... 27

*State v. Allen,*
    94 Ind. 441 (Ind. 1884) .................................................................... 35

*State v. Callicutt,*
    69 Tenn. 714 (Tenn. 1878) ............................................................... 35

*State v. Wilforth,*
    74 Mo. 528 (1881) ............................................................................ 29

*United States v. Daniels,*
    --- F. Supp. 3d ---, 2022 WL 2654232 (S.D. Miss. July 8, 2022) ...................... 36

*United States v. Krilich,*
    159 F.3d 1020 (7th Cir. 1998) ................................................... 50, 51

*Warner v. Smith,*
    8 Conn. 14 (1830) ............................................................................ 50

*Waubanascum v. Shawano Cnty.,*
    416 F.3d 658 (7th Cir. 2005) ............................................................ 39

**Statutes**

20 ILCS

505/5(g)(2) ............................................................................................ 7
505/5(k) ................................................................................................. 6
505/5(m)(2) ........................................................................................... 6
505/5(n) ............................................................................................. 6, 7
505/5(u-5) ............................................................................................ 7
505/7 ..................................................................................................... 7
521/5 ..................................................................................................... 7

105 ILCS 5/24-24 ..................................................................... 28, 47

225 ILCS

10/2.05 .................................................................................................. 7
10/2.17 ............................................................................................... 6, 7
10/2.18 .................................................................................................. 5
10/3(a) .................................................................................................. 7
10/3(c) .................................................................................................. 5
10/5(h) .................................................................................................. 5
10/7(a) .................................................................................................. 7
10/7(a)(5) ............................................................................................. 7
10/7(12)-(15) ........................................................................................ 3

430 ILCS 66/65(a)(2) ................................................................................ 6

705 ILCS 405/1-3(8) ................................................................................. 7

705 ILCS 405/2-27(1)(d) .......................................................................... 6

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1331 ...................................................................................... 1

28 U.S.C. § 2107(a) .................................................................................. 1

42 U.S.C. § 1983 ...................................................................................... 1

**Rules and Regulations**

15 Ill. Reg. 15088 (Oct. 18, 1991) ......................................................... 29

16 Ill. Reg. 7602 (May 15, 1992) ........................................................... 29

23 Ill. Reg. 7877 (July 16, 1999) ................................................................ 43

25 Ill. Reg. 5731 (Apr. 27, 2001) ............................................................... 29

44 Ill. Reg. 6019 (eff. Apr. 1, 2020) ............................................................ 8

89 Ill. Admin. Code

    § 402.8 ............................................................................................. 8, 39
    § 402.8(a) ............................................................................................... 5
    § 402.8(a)(17) ................................................................................... 6, 31
    § 402.8(a)(18) ................................................................................... 6, 31
    § 402.8(o) ........................................................................... 3, 8, 44, 48
    § 402.12 ....................................................................................... 8, 39, 46
    § 402.25 ................................................................................................... 7
    § 402.27 ....................................................................................... 8, 39, 46
    § 406.8(a) .......................................................................................... 3, 5
    § 406.14 ................................................................................................... 5
    § 406.17 ................................................................................................... 5
    § 406.26 ................................................................................................... 5

Fed. R. App. P. 4(a)(1)(A) ........................................................................... 1

**Other Authorities**

Thomas M. Cooley,
    *Treatise on Constitutional Limitations* 740 (5th ed. 1883) .............................. 35

DCFS Policy Guide 2019.05,
    *Family First Model Foster Home Standards* (June 28, 2019), ........................ 8

Sanford J. Fox, *Juvenile Justice Reform: An Historical Perspective*,
    22 Stan. L. Rev. 1187 (1970) ......................................................... 48, 49

Judge Ernestine Steward Gray, *The Adoption and Safe Families Act of 1997:
    Confronting an American Tragedy*, 46 La. B.J. 477 (1999) ............................ 48

Ordinances of the City of New York § IV (1763) ................................... 34, 49

U.S. Dep't of Health and Human Servs., National Model Foster Family Home
    Licensing Standards (Feb. 4, 2019) .............................................. 8, 43

# JURISDICTIONAL STATEMENT

The jurisdictional statement of Plaintiffs-Appellants Jennifer J. Miller, Darin E. Miller, Second Amendment Foundation, Inc., Illinois State Rifle Association, and Illinois Carry is not complete and correct. Defendants-Appellees Marc D. Smith, in his official capacity as Director of the Illinois Department of Children and Family Services ("DCFS"), and Kwame Raoul, in his official capacity as Illinois Attorney General, provide this jurisdictional statement under Circuit Rule 28(b).

Plaintiffs brought this action in the district court under 42 U.S.C. § 1983, and alleged in the operative complaint that defendants violated their rights under the Second Amendment to the United States Constitution. Docs. 1, 19.[1] The district court had subject matter jurisdiction over this federal claim under 28 U.S.C. § 1331.

On March 14, 2022, the district court entered summary judgment in favor of defendants. Doc. 65. On March 15, 2022, a separate judgment order was entered on the docket pursuant to Federal Rule of Civil Procedure 58. Doc. 66. No motion to alter or amend the judgment was filed.

On March 24, 2022, plaintiffs filed a timely notice of appeal within 30 days of the Rule 58 judgment. Doc. 67; *see* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A). This court has jurisdiction over the appeal from a final judgment pursuant to 28 U.S.C. § 1291.

---

[1] The district court's docket is cited as "Doc.__ at __," the Appellants' Brief as "AT Br. ___," and the Short Appendix as "SA__."

## ISSUES PRESENTED FOR REVIEW

1.      Whether DCFS regulations prohibiting handguns and requiring other firearms and ammunition to be safely stored in day care homes during operating hours are lawful under the Second Amendment, where day care homes are sensitive places and where such regulations are consistent with historical tradition.

2.      Whether DCFS regulations requiring the safe storage of firearms and ammunition in foster homes are lawful, where DCFS, in its capacity as legal guardian for foster children, has permissibly imposed these requirements on foster caregivers, in their capacities as government contractors; where foster homes are sensitive places; and where such regulations are consistent with historical tradition.

3.      Alternately, whether plaintiffs waived their rights by agreeing to comply with the DCFS firearms regulations as a condition of day care and foster care licensure.

**INTRODUCTION**

Protecting children from danger is among the most important obligations that we undertake as a society. In Illinois, the legislature has enacted myriad laws to promote child safety and has tasked the Department of Children and Family Services with carrying out the mission of protecting children. At issue in this case are two measures that protect the health and safety of children by regulating the manner of possession and storage of firearms in day care homes and foster homes. The "Day Care Rule," which applies only during the operating hours of the day care home, prohibits handguns on day care premises and requires that all other firearms be kept locked and in a disassembled state without ammunition, which must be stored separately in a locked location. 225 ILCS 10/7(a)(12)-(15); 89 Ill. Admin. Code § 406.8(a)(17)-(18). The "Foster Rule" requires foster caregivers to store their firearms locked, unloaded, inaccessible to children, and separately from ammunition, which also must be stored locked and inaccessible to children. 89 Ill. Admin. Code § 402.8(o).

Plaintiffs contend that these regulatory measures (collectively, the "DCFS Rules") are incompatible with the Second Amendment. But this is incorrect, as the district court rightly concluded. Indeed, the constitutionality of the DCFS rules has since been underscored by the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), which expanded on the "sensitive places" doctrine and clarified that the appropriate legal framework for Second Amendment claims is rooted in text and history. Where relevant, this brief

addresses the issues presented in light of *Bruen*, under which the district court's conclusion remains correct for multiple, independent reasons.

To start, the Day Care Rule is constitutional because, as the district court determined, day care homes are analogous to schools, and thus, under *Bruen*, are sensitive places where States may lawfully prohibit firearms. Alternately, the district court's decision should be affirmed because the historical record shows that the Day Care Rule is consistent with a robust historical tradition of enacting regulations to prevent children from accessing firearms and ammunition.

As to the Foster Rule, the district court correctly reasoned that DCFS, in its capacity as legal guardian of the children in foster care, may require foster caregivers, who are government contractors, to safely store their firearms. Indeed, DCFS owes an affirmative duty to provide foster children with their constitutionally protected right to a safe and secure home. In any event, the Foster Rule is constitutional for two additional reasons: foster homes are sensitive places, and the Foster Rule's requirements are consistent with historical tradition.

Finally, even if the DCFS Rules infringed upon Second Amendment rights (and they do not), this court may affirm because the Millers waived their right to store their firearms unencumbered by the DCFS Rules. Indeed, both Jennifer and Darin Miller signed application forms indicating that they had read, understood, and would comply with the DCFS Rules upon licensure. All told, these important regulatory measures protect children in a manner consistent with the Second Amendment, and thus should be upheld.

## STATEMENT OF THE CASE

### A.    Regulatory background.

In Illinois, DCFS is charged with providing, licensing, and operating a wide range of services related to children and their families.  As part of these responsibilities, DCFS licenses and oversees day care homes, 225 ILCS 10/3(c), which are family homes that provide childcare services for three to twelve children for less than 24 hours a day, *id.* 10/2.18.  To ensure the wellbeing of children at these facilities, DCFS has promulgated a comprehensive set of health and safety standards, including storing knives, medication, scissors, and hazardous materials in places inaccessible to children; ensuring the home is free from lead paint; refraining from smoking while children are present; and providing an outdoor space that is safe for children to play.  89 Ill. Admin. Code §§ 406.8(a), 406.14, 406.17.  Day care home licensees must allow DCFS to inspect their home to determine compliance with the licensing standards at any time during operating hours, and no less than once per year.  *Id.* § 406.26; 225 ILCS 10/5(h).

Day care home licensees must also abide by a set of firearm and ammunition regulations that DCFS adopted pursuant to a legislative mandate.  225 ILCS 10/7(12)-(15).[2]  The Day Care Rule prohibits handguns on the premises of day care homes during operating hours unless in the possession of peace officers or other adults who must possess a handgun as a condition of employment and reside in the

_____

[2]  For purposes of this brief, the term "Day Care Rule" encompasses the statutory and regulatory provisions at issue.

day care home. 89 Ill. Admin. Code § 406.8(a)(17). The Rule also requires that other firearms "be kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children." *Id.* § 406.8(a)(18). Ammunition must likewise be "kept in locked storage separate from that of the disassembled firearms, inaccessible to children." *Id.* Additionally, the operator of the home must "post a 'no firearms' sign . . . in a visible location where parents pick up children" and, if applicable, "notify the parents or guardian of any child accepted for care that firearms and ammunition are stored on the premises and that such firearms and ammunition are locked in storage inaccessible to children." *Id.* § 406.8(a)(17)-(18).[3]

In addition to overseeing and licensing day care facilities, DCFS serves as the legal guardian for children in the foster care system. Children enter the care and custody of DCFS for a variety of reasons, including neglect, abuse, abandonment, and dependency. *E.g.*, 20 ILCS 505/5(m)(2), (k); 705 ILCS 405/2-27(1)(d). In these circumstances, DCFS has the legal authority to place children in substitute care apart from their parents or guardians when it is in the best interests of the child. *E.g.*, 20 ILCS 505/5(n). Relevant here, foster homes provide temporary placements for children in the care and custody of DCFS who need substitute care. 225 ILCS 10/2.17.

---

[3] The Illinois Firearm Concealed Carry Act prohibits the carriage of firearms in childcare facilities. 430 ILCS 66/65(a)(2). Plaintiffs do not challenge that provision. Doc. 19 ¶ 31.

DCFS retains legal custody of children placed in a foster home; guardianship does not transfer to the foster caregivers. 705 ILCS 405/1-3(8). When DCFS is awarded guardianship of a child, DCFS is given the rights and responsibilities of legal custody and is required to act in the child's best interests. *Id.* Foster caregivers must thus obtain prior written consents from DCFS for decisions involving health care and treatment, religious instruction in a different faith, work programs, induction into the armed services, driving a car, and extensive trips, among others. 89 Ill. Admin. Code § 402.25. Of paramount importance to DCFS as legal guardian is the protection, health, and safety of children in its care. *E.g.*, 20 ILCS 505/5(g)(2); *id.* 505/7(7); 225 ILCS 10/7(a)(5). In fact, DCFS has an affirmative duty to provide a safe home environment to foster children. 20 ILCS 521/5; *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998).

To ensure the welfare of children in foster care, foster homes must comply with applicable licensure, health, and safety standards established by DCFS. 225 ILCS 10/3(a); *id.* 10/2.05; *id.* 10/2.17; *id.* 10/7(a). Although licensure is not required for all foster placements—for example, relatives or "fictive kin" of foster children need not be licensed, 20 ILCS 505/7(b)—licensure is required to receive the subsidies offered by DCFS to offset expenses incurred in caring for a foster child, *id.* 505/5(n), (u-5). Among other health and safety requirements, foster care licensees must remove fire hazards and unsafe children's products from the residence; store tools, medication, alcohol, and other dangerous household supplies away from children; and refrain from smoking in the foster home or any vehicle used to

transport children.  89 Ill. Admin. Code § 402.8.  Additionally, foster homes are subject to supervision and inspection by DCFS "at least semiannually" to ensure compliance with licensing requirements.  *Id.* §§ 402.12, 402.27.

Licensees must also comply with safe storage requirements for firearms and ammunition.  Specifically, the Foster Rule requires that "[a]ny and all firearms and ammunition shall be stored and locked up separately at all times and kept in places inaccessible to children."  *Id.* § 402.8(o).  It further provides that "[l]oaded guns shall not be kept in a foster home unless required by law enforcement officers."  *Id.*

Both Rules have long pedigrees:  DCFS first required the safe storage of firearms in day care homes in 1983, and in foster homes in 1981.  Doc. 56-3 at 3-10 (history of the Rules).  The Foster Rule was most recently amended in 2020 to comply with the 2019 National Model Foster Family Home Licensing Standards, which were issued under the Family First Prevention Services Act signed into law by President Trump on February 9, 2018.  *E.g.*, DCFS Policy Guide 2019.05, *Family First Model Foster Home Standards* (June 28, 2019), https://bit.ly/3AhQbor; 44 Ill. Reg. 6019 (eff. Apr. 1, 2020).  Relevant here, these standards call for keeping "[w]eapons and ammunition (separately) stored, locked, unloaded, and inaccessible to children."  U.S. Dep't of Health and Human Servs., National Model Foster Family Home Licensing Standards, at 8 (Feb. 4, 2019), https://bit.ly/3cA1Jvq.

## B.    **Plaintiffs file suit.**

In 2018, plaintiffs filed an action alleging that defendants violated their rights under the Second and Fourteenth Amendments by administering and

enforcing the Day Care Rule.  Doc. 1 ¶¶ 33-36.  In 2019, plaintiffs filed the operative, amended complaint, alleging that both the Day Care and Foster Rules violated their Second Amendment rights, facially and as-applied.  Doc. 19 ¶¶ 43-53. Relevant here, plaintiffs alleged that Jennifer has held a day care home license since 2017, and that both she and her husband, Darin, are licensed foster caregivers.  *Id.* ¶ 10.  They also alleged that the Millers have licenses to possess and carry firearms, *id.* ¶¶ 10, 12, and would possess loaded firearms in their home, but refrain from doing so to comply with the DCFS Rules, *id.* ¶¶ 14-16.  The Millers are members of the three organizational plaintiffs.  *Id.* ¶ 23.

## C.  Defendants move for summary judgment.

In November 2021, defendants moved for summary judgment.  Doc. 56. Relevant here, they first argued that the DCFS Rules fall outside of the scope of the Second Amendment as a matter of history and tradition, *id.* at 36-41, and, in any event, constitute "presumptively lawful regulatory measures" under *District of Columbia v. Heller*, 554 U.S. 570 (2008), because day care homes are sensitive places, *id.* at 42-43, and because the government may impose reasonable conditions on foster caregivers, who are government contractors, *id.* at 43-44.  In the further alternative, the Rules are constitutional because they are substantially related to an important governmental objective.  *Id.* at 48-55.  Finally, defendants contended, the Millers waived their rights to keep and store firearms in a manner inconsistent with the DCFS Rules.  *Id.* at 27, 56.  Defendants submitted the following evidence as support.

***The Millers' Licensure.***  In 2016, the Millers obtained a license to become foster caregivers shortly after they agreed to foster a family member's newborn baby.  Doc. 56-5 at 183:1-14.  Although DCFS did not require licensure under those circumstances, they elected to obtain a license to receive the DCFS stipend.  *Id.* When applying for a license, the Millers signed several forms acknowledging the DCFS standards for foster family homes, including two forms that contained a restatement of the Foster Rule:  a "Foster Family Firearms Agreement" and an "Acknowledgement of Compliance, Part 402, Licensing Standards for Foster Family Homes."  Doc. 56-1 at 6-8.  The Millers kept their license after that foster placement ended and have since fostered another newborn baby.  *Id.* at 184:13-17.  The Millers received $400 a month for one of the foster children, and $1,400 a month for the other, who had special needs.  Doc. 56-4 at 239:22-240:3.

Jennifer is also a DCFS-licensed day care home operator.  Doc. 56-5 at 153:8-13.  Darin helps in the day care home, but is not a licensee.  Doc. 56-4 at 15:5-7. When applying for her license in 2017 and renewing it in 2019 and 2021, Jennifer signed documents acknowledging that she reviewed the licensing standards.  Doc. 56-1 at 14.  Jennifer also signed a Firearms Agreement in 2019 that restated the Day Care Rule.  *Id.* at 16.

The day care operated out of the Millers' home is Jennifer's business.  At the time of the deposition, Jennifer cared for four children under the age of three during the day, five additional children after school, and three children in the evening.

Doc. 56-5 at 158:14-25.  Jennifer charges for her childcare services, Doc. 56-5 at 160:6-16, and earned $68,000 from the day care in 2019, *id.* at 18:21-23.

To comply with the DCFS Rules, the Millers store their handguns unloaded and locked in safes in Darin's truck (which he parks on the street), their long guns in a safe in their bedroom, and their ammunition in a separate lock box.  Doc. 56-4 at 71:9-17, 73:4-15, 85:2-24, 249:22-23.  In the absence of the Rules, Darin would carry one or two loaded handguns on his person in his home, including during day care hours.  Doc. 56-4 at 24:9-18, 25:20-22, 30:8-11.  Specifically, he would carry one in a holster on his waist, and another in a holster on his ankle.  *Id.* at 28:2-14. Additionally, he would store their remaining three handguns in a safe in their home (some of which may be loaded), as well as a loaded Olympic Arms AR-15 and another seven unloaded firearms.  *Id.* at 26:6-27:4, 52:9-13, 61:10-14, 185:22-198:24, 202:1-209:4; Doc. 56-5 at 106:5-7.  Darin also has "a 10-round magazine and 30-round magazines" for the AR-15.  Doc. 56-4 at 199:14-15.

***DCFS Practices and Procedures.***  Defendants submitted testimony from a Rule 30(b)(6) witness about the purpose and scope of the DCFS Rules.  As to the purpose, the witness testified that DCFS promulgated the Day Care Rule both to comply with the statutory requirements and to "protect[ ]children," since "[r]estricting access to firearms and ammunition prevents death, serious injury, and suicide."  Doc. 56-2 at 20:15-21:15; *id.* at 110:6-10.  Likewise, she explained that the Foster Rule "is consistent with [DCFS's] mandate to protect children" because

"[r]educing children's access to firearms and ammunition protects against death, serious injury, and suicide." *Id.* at 26:16-20.

As to their scope, the witness testified that the Day Care Rule, like all other day care home rules, only applies during operating hours. *Id.* at 58:22-59:8. This limitation is consistent with the fact that DCFS only has "authority in day care homes during day care hours." *Id.* at 58:8-9. There can thus be no "rule violation outside of hours." *Id.* at 61:9-10. Accordingly, if an adult residing in the day care home has a handgun on the premises outside of operating hours, they "would not be in violation of a rule." *Id.* at 63:3-12. By contrast, the Foster Rule applies at all times, even when there is no child placed in the foster home, "because a foster child could come into [the] care of a foster family at any moment." *Id.* at 65:2-9, 19-23.

***Cornell Expert Report.*** Additionally, defendants submitted the expert report of Saul Cornell. Doc. 57. Cornell is a professor at Fordham Law School and University, with expertise in the history of gun regulation, the right to bear arms, and American legal and constitutional history. *Id.* at 4-5. His scholarship has appeared in leading law reviews and legal history journals, and have also "been widely cited by state and federal courts." *Id.*

While preparing his report, Professor Cornell reviewed historical evidence, including state laws regulating the storage of loaded weapons in homes, prohibitions on arms in sensitive places, bans on weapons in schools and other places in which children are likely to gather, and prohibitions on the sale or possession of firearms by minors. *Id.* at 6-7. Based on his expertise and review of

these sources, Cornell concluded that the DCFS Rules "are consistent with the historical power and tradition of state regulation." *Id.* at 6.

As support for this conclusion, Cornell provides specific examples of historical regulations that are similar or analogous to the DCFS Rules, as well as historical context and tradition. As described below, *see infra* Sections III and IV, Cornell set forth historical support for the regulation of firearms in sensitive places such as schools and other "locations where children gather and are educated." *Id.* at 6. He also compiled and assessed a wide variety of laws that were aimed at limiting access to firearms and ammunition by minors, *id.* at 20, to protect their "interests and safety from possible harm and injury," *id.* at 6. Among other regulations, States and localities enacted laws targeting the discharge of firearms by minors and banning their possession, purchase, or use. *Id.* at 17, 20-22. They also restricted children's access to firearms by regulating the actions of parents and guardians, including by "sing[ling] out guardians for punishment for firearms infractions for those under their charge." *Id.* at 20.

***Miller-Azrael Expert Report.*** Defendants also submitted the joint expert report of Dr. Deborah Azrael, PhD, and Dr. Matthew Miller, MD ScD. Doc. 56-14 at 4. Dr. Azrael is the Director of Research at the Harvard Injury Control Research Center in the Harvard School of Public Health and has conducted epidemiologic research on firearms-related injuries for the past 25 years. *Id.* at 5. Dr. Miller is a professor at Northeastern University, an adjunct professor at the Harvard School of Public Health, and Co-Director of the Harvard Injury Control Research Center. *Id.*

at 4. He has conducted empirical research on firearms-related injuries and violence prevention for over 20 years, publishing over 150 peer-reviewed articles. *Id.*

In their report, Azrael and Miller first outlined the scope of firearm injury and death in children. They reported that, in "2019, as had been true for each of the past 10 years, firearm injury was the second or third leading cause of death among US children aged 1 to 17." *Id.* at 6. In Illinois, approximately 100 children are killed by a firearm each year, and another 300-500 are injured by firearms and survive. *Id.* at 7. Furthermore, the "large majority" of firearm deaths of children under 14 occur in the home, and most firearm suicides among children of any age take place in their home using a firearm owned by a family member. *Id.*

The report next explained how access to firearms in the home increases the risk of suicide, homicide, and unintentional firearm injury to children. *Id.* at 7-15. To start, a large body of literature has shown that access to firearms "increases suicide risk by making it more likely that suicidal acts will involve firearms and therefore will be more likely to result in death." *Id.* at 10. In fact, there is "a greater than three-fold increase in the odds of suicide among children and adults who live in homes with firearms, compared to those who live in homes with no firearms." *Id.* at 8. And in homes with firearms, evidence shows that safe storage practices decrease the risk of intentional firearm injury and suicide for children. *Id.* at 10. Azrael and Miller thus concluded that storing firearms "in ways that make

them less accessible to children reduces the risk of intentional self-inflicted injury and suicide." *Id.* at 11.

Azrael and Miller also examined the relationship between access to firearms in the home and both homicide and unintentional firearm death or injury. *Id.* at 11-13. According to several studies, the presence of firearms in the home increases the risk of homicide victimization and unintentional injury for household members. *Id.* at 11-12. But in households with firearms, data indicates that storing those firearms while they are locked and unloaded, with ammunition stored separately, reduces the risk of unintentional firearm deaths for children. *Id.* at 12-13.

Finally, the report described how parents and other adults often "fail to appreciate the risk" posed by household firearms to children. *Id.* at 14. These adults "may also believe their household firearms, however stored, are inaccessible to children when they are not." *Id.* In one study, for example, "39% of parents who reported that their children did not know the storage location of household guns and 22% of parents who reported that their children had never handled a household gun were contradicted by their children's reports." *Id.*

Azrael and Miller thus concluded "that fewer children attending in-home daycare and/or housed in foster homes in Illinois will die or be injured by gunfire if the [DCFS Rules] are in effect, compared to what would be the case if these regulations were not in place or relaxed." *Id.* at 5. Additionally, because there is no evidence suggesting that "there is a countervailing mortality benefit to children if they live in a household where firearms are present and/or accessible, . . . relaxing

or eliminating these rules can be expected to result in a net increase in injury and mortality to children." *Id.* at 5-6.

## D.    Plaintiffs oppose defendants' summary judgment motion.

Plaintiffs opposed defendants' motion.  Doc. 63.  Plaintiffs first argued that history and tradition do not support the DCFS Rules—specifically, that the statutes relied on by Professor Cornell are insufficient.  *Id.* at 10-11.  Plaintiffs, however, offered no contrary expert testimony or historical evidence.  *Id.*  Plaintiffs also contended that foster homes are not sensitive places, but did not press the same argument for day care homes.  *Id.* at 12-13.  Next, plaintiffs asserted that the DCFS Rules failed to satisfy means-ends scrutiny.  *Id.* at 14.  Finally, plaintiffs asserted that the Millers did not waive their Second Amendment rights and that any such waiver would violate the unconstitutional conditions doctrine.  *Id.* at 5-9.

## E.    The district court enters summary judgment in favor of defendants.

The district court granted summary judgment to defendants upon concluding that the DCFS Rules do not violate the Second Amendment, either facially or as applied to the Millers.  SA2, SA26.  The court focused on the DCFS Rules as applied to the Millers because plaintiffs "have not offered any reason why the DCFS Rules are unconstitutional as applied to any broad swath of affected persons other than the Millers."  SA26.  The court further concluded that the Millers had not waived their Second Amendment rights because there was a genuine issue of material fact as to whether the Millers knew that they were waiving those rights by signing the

foster care application materials and because the form that Jennifer signed as part of the day care application was not specific enough to constitute a waiver. SA15-25.

On the merits of the Second Amendment claim, the court first addressed the Day Care Rule under the then-governing two-step framework announced in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (*Ezell I*). SA27-30. At the threshold, the court noted that day care homes are sensitive places because they are "designated spaces for the care of young children" and because "a ban on firearms in day cares is closely analogous to a ban on firearms in schools, which is one of the core 'presumptively lawful' measures referenced in *Heller*." SA32.

The court then concluded that defendants satisfied their burden under intermediate scrutiny. SA36. Specifically, the court accepted the findings of the Miller-Azrael Report that the Day Care Rule "will reduce the risk of accidental injury or death from gunfire to young children in day care homes." SA38. The court also found that the Rule was narrowly tailored because, as applied to the Millers, it "applies only during the daytime hours when their home most closely resembles a school or 'other sensitive place' where restrictions on firearms are presumptively lawful," and it "places no restrictions on the Millers' Second Amendment rights at night, when the need to defend the home may be greatest." SA39.

The court next turned to the Foster Rule. SA40. As with the Day Care Rule, the court focused on the second step of the analysis and concluded that defendants satisfied their burden under intermediate scrutiny. SA40-41. In terms of relevant considerations, the court noted that, while the Foster Rule is broader in its

application than the Day Care Rule because it applies at all times, SA40, it also "imposes a much less substantial burden" on Second Amendment rights because it does not prohibit handguns and its storage requirements are not as onerous. SA41.

The court also focused on the unique nature of the foster relationship, in that "a foster caregiver license allows private individuals to provide child care services for the State of Illinois itself." SA41-42. And in these circumstances, "DCFS, not the foster parent, is typically the legal guardian of children placed into foster homes, and DCFS has a continuing obligation to act in the best interests of foster children." SA42. In other words, the foster caregivers are government contractors who must comply with the standards "designed to ensure the safety of foster children." *Id.* To become foster caregivers, the "Millers accepted these burdens and restrictions in exchange for the benefits of licensure, including the payments DCFS provides to defray the expenses associated with caring for the foster child." SA43.

## SUMMARY OF ARGUMENT

At summary judgment, defendants marshaled substantial, unrebutted evidence demonstrating that the Day Care and Foster Rules were constitutional, including an expert report explaining the many ways in which the Rules were consistent with the historical tradition of firearms regulation in the eighteenth and nineteenth centuries. The district court rightly entered summary judgment in defendants' favor upon concluding that they had satisfied their burden under the then-governing two-part test that this court announced in *Ezell I*. As part of this analysis, the district court concluded that day care homes were sensitive places because they are analogous to schools, and that DCFS, in its capacity as legal guardian for the children in its care, could require foster caregivers to safely store firearms and ammunition kept in the foster home.

In the intervening months, the Supreme Court issued a decision in *Bruen*, which expanded on the sensitive places doctrine and clarified that the appropriate legal standard focuses on the plain text of the Second Amendment and the historical tradition of firearms regulations. The district court's conclusion, as well as much of the analysis underlying that conclusion, remains correct, even after *Bruen*. In fact, in many important respects, *Bruen* underscores that measures like the DCFS Rules—which regulate sensitive places and are grounded in a robust historical tradition of protecting children from the dangers of firearms—are constitutional.

The Day Care Rule is constitutional because, as the district court correctly determined, day care homes are analogous to schools, and thus are sensitive places.

Under *Bruen*, this finding is dispositive, and warrants affirmance. In any event, affirmance is appropriate because the unrebutted historical evidence set forth by defendants shows that the Day Care Rule is consistent with the historical tradition of enacting regulations to prevent children from accessing firearms and ammunition.

The Foster Rule is likewise constitutional for multiple independent reasons. As an initial matter, the district court properly determined that the requirements in the Foster Rule are valid and permissible conditions for DCFS, in its capacity as legal guardian of foster children, to impose on the foster caregivers who serve as government contractors. The Foster Rule is also constitutional on two additional bases: foster homes are sensitive places, and the requirements imposed by the Foster Rule are consistent with historical tradition.

In the further alternative, this court may affirm the district court's decision because the Millers waived their right to store their firearms unencumbered by the DCFS Rules when they obtained licenses. Indeed, the Millers signed several forms indicating that they would comply with the terms of the Foster Rule upon licensure, and Jennifer did the same with respect to the Day Care Rule during the application and renewal process for her day care license.

## ARGUMENT

## I. The Standard Of Review Is *De Novo.*

This court reviews *de novo* a district court's grant of summary judgment. *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011). On *de novo* review, this court applies the same legal and procedural standards that the district court would in deciding whether a claim should have been dismissed, *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010), and may affirm on any ground supported by the record and law, *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 912 (7th Cir. 2011).

"Summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact and that a moving party is entitled to judgment as a matter of law." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (cleaned up). The initial burden rests with the movant to show that there is no material dispute of fact "with respect to an essential element" of the nonmovant's substantive claim. *MMG Fin. Corp.*, 630 F.3d at 657. If that is met, the nonmovant must offer sufficient evidence from which a reasonable jury could find in its favor. *Id.* at 656. If that burden is not met, the movant "need not produce evidence of its own" but instead is entitled to judgment. *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) (cleaned up).

## II. The Second Amendment Allows States To Regulate Firearms In Sensitive Places And In A Manner Consistent With Text and Historical Tradition.

The Second Amendment confers the right to "'law-abiding, responsible citizens'" to possess and carry firearms in self-defense. *Culp v. Raoul*, 921 F.3d 646, 649 (7th Cir. 2019) (quoting *Heller*, 554 U.S. at 635). But "like most rights, the right secured by the Second Amendment is not unlimited." *Id.* (cleaned up). On the contrary, it has long been understood "that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* (cleaned up). Indeed, the Supreme Court made clear in both *Heller* and *McDonald v. Chicago*, 561 U.S. 742 (2010), that nothing should cast doubt on longstanding, "presumptively lawful measures" such as "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* (cleaned up); *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015) (Second Amendment "does not imperil every law regulating firearms").

These principles were recently reaffirmed in *Bruen*, a case where the Supreme Court struck down New York's "shall issue" concealed carry licensure scheme upon concluding that it violated the right to publicly carry firearms under the Second Amendment. 142 S. Ct. at 2122; *id.* at 2162 (Kavanaugh, J., concurring) (nothing should "be taken to cast doubt on. . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"); *see also id.* at 2157 (Alito, J., concurring) (*Bruen* does not "disturb[ ] anything that we said in *Heller* or *McDonald* . . . , about restrictions that may be imposed on the possession

or carrying of guns").  Indeed, the Court in *Bruen* reiterated that States may lawfully prohibit firearms in sensitive places, which are "in effect exempt" from the Second Amendment.  *Id.* at 2134; *id.* at 2132 (in sensitive places, "arms carrying [can] be prohibited consistent with the Second Amendment").  And it is "settled" that such prohibitions are lawful in "schools and government buildings," as well as "legislative assemblies, polling places, and courthouses."  *Id.* at 2132.

But the Court also made clear that this list of sensitive places was not exhaustive.  On the contrary, courts may identify additional sensitive places in locations where there is a historical record of prohibiting weapons.  *Id.*  The historical record may be based on "relatively few" regulations, so long as there are "no disputes regarding the lawfulness of such prohibitions."  *Id.*  Furthermore, the Court confirmed that the sensitive places doctrine is not confined only to locations where firearms were prohibited in the eighteenth and nineteenth centuries.  *Id.* Indeed, courts may "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."  *Id.*

Sensitive places aside, *Bruen* also clarified that the appropriate legal framework for Second Amendment claims "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  *Id.* at 2131.  In making this clarification, the Court endorsed the first step of the two-part approach that lower courts, including this court, had followed (which focused on text and history), but declined to adopt the

second step (which centered on means-ends scrutiny). *Id.* at 2126-27. Specifically, the Court held "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. To justify its regulation in that case, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

At the threshold step, plaintiffs bear the burden to show that the Second Amendment's plain text covers their proposed conduct and thus presumptively protects that conduct. *See Bruen*, 142 S. Ct. at 2130 (if "plain text covers an individual's conduct . . . the government *must then* justify its regulation") (emphasis added); *id.* at 2141 n.11 ("[*B*]*ecause* the Second Amendment's bare text covers petitioners' public carry, *the respondents here shoulder the burden* of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope.") (emphasis added). If that burden is met, the government must show that the challenged regulation aligns with historical tradition, either by identifying historical regulations that are "distinctly similar" to the challenged regulation or demonstrating that the challenged regulation is analogous to historical regulations. *Id.* at 2131.

To determine whether a historical regulation is an appropriate analogue, courts must assess "whether the two regulations are relevantly similar." *Id.* at 2132 (cleaned up). The Court did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but noted

24

that "*Heller* and *McDonald* point toward at least two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.*  Stated differently, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations."  *Id.* at 2133.

Under this framework, the government need not identify a historical precursor that is a "dead ringer" for the challenged regulation.  *Id.* at 2133; *see also id.* (government need only "identify a well-established and representative historical *analogue*, not a historical *twin*").  This is so because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."  *Id.* at 2132.  As one example, the Second Amendment's "reference to 'arms' does not apply only to those arms in existence in the 18th century."  *Id.* (cleaned up).  Instead, it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Id.* (cleaned up).

## III.    The District Court Properly Granted Summary Judgment To Defendants On Plaintiffs' Claim That The Day Care Rule Violates The Second Amendment.

The Day Care Rule is constitutional for at least two separate reasons.  First, as the district court held, day care homes are sensitive places because they are analogous to schools, and so, as the Court explained in *Bruen*, are locations "where arms carrying [can] be prohibited consistent with the Second Amendment."  142 S. Ct. at 2132.  Second, the unrebutted historical evidence set forth by defendants

below demonstrates that the regulations in the Day Care Rule are consistent with historical tradition.

In addressing the constitutionality of the DCFS Rules, the scope of this court's analysis should be limited to plaintiffs' as-applied challenge because, as the district court noted, plaintiffs failed to "offer[ ] any reason why the DCFS Rules are unconstitutional as applied to any broad swath of affected persons other than the Millers." SA26. On appeal, plaintiffs do not dispute this determination, and thus have forfeited any challenge to it. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017). In any event, the district court was correct; the organizational plaintiffs rely on no claims of their own, AT Br. 9 n.1; Doc. 19, and the only members that they identified as day care home or foster care licensees are the Millers, Docs. 56-10, 56-11, Doc. 56-9 at 93-94. Beyond those limitations, plaintiffs cannot satisfy the standard for facial challenges because they presented no evidence as to why the DCFS Rules are "wholly invalid and cannot be applied *to anyone*." *Ezell I*, 651 F.3d at 698.

## A. The Day Care Rule comports with the Second Amendment because day care homes are sensitive places.

The district court correctly concluded that day care homes are sensitive places, SA32—a proposition that plaintiffs did not specifically contest before the district court, Doc. 63 at 12-13. As the court explained, day care homes fall within this category because they are "designated spaces for the care of young children" and because "a ban on firearms in day cares is closely analogous to a ban on firearms in schools." SA32. The court factored that finding into the then-governing

two-part framework. SA29-30. As discussed, however, under *Bruen* this finding is dispositive—the Court there explained that the Second Amendment allows States to prohibit firearms in sensitive places. 142 S. Ct. at 2132. And because the district court's conclusion—that day care homes are sensitive places because they are analogous to schools—was correct, affirmance is warranted on this ground alone.

Indeed, day care homes are analogous to schools in a number of respects. To start, the day-to-day operations of both schools and day cares revolve around the care, protection, and education of children. Accordingly, the presence of children in both schools and day cares, often in congregate settings, is a primary and necessary feature of these facilities during their hours of operation. *E.g.*, *supra* pp. 5, 10; *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated,* 611 F.3d 1015 (9th Cir. 2010) (noting that in *Heller*, the "Court listed schools and government buildings as examples, presumably because possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children)"); *Solomon v. Cook Cnty. Bd. of Commissioners*, 559 F. Supp. 3d 675, 693 (N.D. Ill. 2021) (remarking that "[w]hen a location is designated as a 'sensitive place,' all examples of that location tend to have the trait that justifies the designation," such as, "[f]or instance, all schools have groups of children present . . . .").

And when children attend school or day care, they are entrusted into the care of educational and childcare professionals, who are licensed and overseen by state agencies. *Supra* p. 5; *see also, e.g.*, *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 281 Va. 127, 136 (2011) (public university a sensitive place in part because

"parents who send their children to a university have a reasonable expectation that the university will maintain a campus free of foreseeable harm").  The regulatory schemes governing schools and childcare facilities are thus designed, among other things, to ensure the safety and well-being of the children in attendance.  *Supra* p. 5; 105 ILCS 5/24-24 (educational professionals "stand in the relation of parents and guardians to the pupils" and may exercise authority under that relationship "at any time for the safety and supervision of the pupils in the absence of their parents or guardians").

These shared attributes—which center on the protection of children while in the care of state-licensed facilities—are sufficient to satisfy the standard outlined in *Bruen*, which recognized that courts may use analogies to existing sensitive places "to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."  142 S. Ct. at 2132. But to the extent additional analysis is warranted—such as the "how and why" method articulated by the Court in its historical tradition discussion, *id.*—that standard is satisfied here, too.

To begin, the uncontested evidence shows that the justifications for the historical prohibitions on firearms in schools are the same as those underlying the Day Care Rule:  protecting the health and safety of children.  Indeed, as Professor Cornell explained, "[o]ne of the most important consequences of the American Revolution was the transformation of traditional English common law ideas into a set of republican legal principles," including a vision of "family law in which the

safety and well-being of the child became the paramount guiding principle in the law." Doc. 57 at 19. One way in which States and localities protected the safety of children was to prohibit firearms in "[s]chools and other places in which individuals, including minors, gathered." *Id.* at 20-21; *id.* at 6 (firearms regulations in "locations where children gather and are educated" enacted "in accordance with the heightened need to protect minors' interests and safety from possible harm and injury"); *State v. Wilforth*, 74 Mo. 528, 529-30 (1881) (concealed carry prohibition in schools "directed against the practice of carrying concealed weapons or firearms, and the pernicious consequences flowing from such a practice"); *Rainey v. State*, 8 Tex. App. 62, 63 (1880) (prohibition on firearms in schools protects the people assembled).

Likewise, the Day Care Rule protects the safety of children receiving services at day care homes, as DCFS has consistently asserted. *E.g.*, 25 Ill. Reg. 5731 (Apr. 27, 2001) (amendments intended to "improve health and safety in day care homes by outlining more precisely basic health and safety measures"); 16 Ill. Reg. 7602 (May 15, 1992) (amendments make "changes necessary for the health and safety of children receiving day care services"); 15 Ill. Reg. 15088 (Oct. 18, 1991) (amendment establishes minimum "safety" requirements). For example, the Rule 30(b)(6) witness testified that DCFS promulgated the Day Care Rule because it "protects

children" by "[r]educing access to firearms and ammunition prevents death, serious injury, and suicide." Doc. 56-2 at 20:15-21:15; *id.* at 110:6-10.[4]

This testimony is consistent with the large body of empirical evidence cited by Drs. Azrael and Miller in their expert report, which concluded that children in day care homes are safer because of the Rule: specifically, that "fewer children attending in-home day care . . . in Illinois will die or be injured by gunfire if the . . . [Day Care Rule is] in effect, compared to what would be the case if these regulations were not in place or relaxed." Doc. 56-16 at 5. This is so because decreasing access to firearms—including by storing firearms unloaded and locked, with ammunition stored separately—reduces the risk of firearm injury and suicide in children. *Id.* at 8, 10, 12. Preventing access to firearms in day care homes is particularly important, given the high incidence of firearm deaths among children in the home, including in Illinois. *Id.* at 6-7.[5]

The evidence also confirms that the burdens on day care licensees in Illinois are comparable to, if not more modest than, the historical prohibitions on firearms in schools. As *Bruen* explained, the historical tradition of firearm regulation in this country included complete prohibitions on all firearms in schools. 142 S. Ct. at

---

[4] On appeal, plaintiffs assert that the Rule is not sufficiently tailored to effectuate the goal of protecting children. *E.g.*, AT Br. 44-46. Under *Bruen*, however, this inquiry is no longer part of the analysis, *supra* Section II.

[5] Although this evidence was not rebutted at summary judgment, plaintiffs attempt to discredit it on appeal by citing articles and studies that they did not present to the district court. *E.g.*, AT Br. 42-44. These efforts to create genuine issues of material fact by backfilling the record should be rejected. *E.g.*, *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003).

2133.  But the Day Care Rule, which applies only during operating hours, bans just one type of firearm (handguns).  89 Ill. Admin. Code § 406.8(a)(17); Doc. 56-2 at 58:22-59:8.  Licensees may keep all other firearms on the day care premises, so long as they comply with the safe storage requirements.  89 Ill. Admin. Code § 406.8(a)(18).  In fact, the Millers keep several long guns in their gun safes while the day care is open and are able to bring handguns into the home at night when the day care is closed.  Doc. 56-4 at 71:9-17, 73:4-15, 85:2-24, 249:22-23.

Plaintiffs contend, however, that the district court erred in several respects by concluding that day care homes are sensitive places.  Because plaintiffs did not raise these arguments before the district court—and instead only specifically contested the sensitive places analysis in the context of foster homes, Doc. 63 at 12-14—these arguments are forfeited, *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010).  But even if considered, they should be rejected.

Plaintiffs first assert sensitive places should not be extended beyond "actual schools."  AT Br. 21.  But this argument cannot be reconciled with *Bruen*, which allows courts to identify new sensitive places by analogy.  142 S. Ct. 2132.  Plaintiffs then argue that even if sensitive places could be extended beyond schools, the historical evidence only supports limits "on the carrying of firearms by students," and not on "teachers or other adult school employees."  AT Br. 21 (emphases omitted).  But this argument, too, is inconsistent with *Bruen*, which confirmed that States may prohibit firearms on school property, without distinguishing between students and teachers.  142 S. Ct. at 2133.  In any event, plaintiffs' description of

the history is inaccurate.  Among other evidence in the record, Professor Cornell

relied on historical statutes prohibiting all firearms in schools—for example, a

Texas statute prohibiting "any person" from carrying a firearm in "any school-

room."  Doc. 57 at 20; *see also, e.g.*, *Alexander v. State*, 11 S.W. 628, 629 (Tex. App.

1889) (teachers cannot carry firearms in classrooms, noting that "[t]he law does not

. . . accord to them such a privilege," which would have "pernicious" effects).

Plaintiffs also assert that the sensitive places doctrine should not be extended

"outside of school grounds and into a law-abiding citizen's private home."  AT Br. 21

(emphases omitted).  But as the district court noted, the Day Care Rule only applies

during the day care's operating hours, when "their home most closely resembles a

school."  SA39.  When the home is not operating as a licensed business—for

example, during the evening hours—the Day Care Rule does not apply.  Indeed,

*Bruen* recognized that some locations are considered sensitive places when used for

a specific purpose.  There, the Court included polling places in its list of settled

sensitive places, *Bruen*, 142 S. Ct. at 2133, even though some polling places are

found in buildings (such as apartment buildings and retail establishments) that

would not otherwise be considered sensitive under the test announced in *Bruen*.

The same principle applies here:  the Millers' home is a sensitive place when it is

operating as a day care, but not during other times.

Finally, plaintiffs contend that defendants misstate the scope of the Day Care

Rule—under their view, the Rule applies at all times, and not only during operating

hours.  AT Br. 17.  But plaintiffs never offered any evidence to support their theory

or refute defendants' evidence, which included testimony from the Rule 30(b)(6) witness. Doc. 56-2 at 58:22-59:8. As the witness explained, this limitation is consistent with the fact that DCFS only has "authority in day care homes during day care hours," *id.* at 58:8-9, when the home is functioning as a licensed business.

All told, defendants submitted unrebutted evidence demonstrating that day care homes are analogous to schools, and thus, like schools, they are sensitive places where the State may regulate the use and storage of firearms under *Bruen*.

**B.    Alternatively, the Day Care Rule is consistent with the historical tradition of firearms regulation, and thus does not violate the Second Amendment.**

Even if day care facilities were not analogous to schools under the sensitive places doctrine, affirmance is warranted because the Day Care Rule is consistent with the longstanding historical tradition of enacting regulations to protect children by limiting their access to firearms.

As Professor Cornell explains in his expert report, States and localities enacted a number of laws in the period following the American Revolution to promote "the safety and well-being" of children, Doc. 57 at 19-20, including the prohibitions on firearms in schools, *supra* Section III.A. Relevant here, these prohibitions often extended beyond schools to other places where children gathered "for educational, literary, or scientific purposes," as well as to churches and religious assemblies. Doc. 57 at 20-21 (citing 1873 Texas law and 1883 Missouri law).

States and localities also enacted a variety of measures to prevent children from accessing and improperly using firearms elsewhere. *Id.* at 17, 20-22. Some

targeted the discharge of firearms by minors, *e.g.,* Doc. 57-34 (New London, Connecticut); Doc. 57-40 (Memphis, Tennessee); Ordinances of the City of New York § IV (1763) (available at https://bit.ly/3ElPC0c), whereas others focused on minors' possession, purchase, or use of firearms, *e.g.*, Doc. 57 at 20; 1868 Or. Laws 18-19 (available at https://bit.ly/3SKpccX). Within that latter category, Alabama, Florida, Georgia, Kentucky, Mississippi, and Tennessee each banned the sale and transfer of guns by minors. Doc. 57-39; Doc. 57-50; Doc. 57-54; Doc. 57-57; Doc. 57-58; Doc. 57-78.

Other States and localities restricted children from accessing firearms by regulating the actions of parents and guardians, including by "sing[ling] out guardians for punishment for firearms infractions for those under their charge" or by "allow[ing] an exception for guns used while under the supervision of a parent." Doc. 57 at 20 (citing 1803 New York City law and 1903 South Dakota law); *see also, e.g.*, Doc. 57-34 (New London law making parents and guardians liable for unlawful firing of guns by minors); Doc. 57-57 (Mississippi statute holding fathers liable for allowing minor sons to carry concealed certain firearms).

These statutes, which were crafted in response to "the problems posed by minors," *id.* at 20, were more common than laws imposing limits on possession of firearms by convicted felons, *id.* at 19. Indeed, by the end of the nineteenth century, "nineteen States and the District of Columbia had enacted laws expressly restricting" minors' ability to purchase or use firearms. *Nat'l Rifle Ass'n of Am. v. ATF*, 700 F.3d 185, 202 (5th Cir. 2012). These statutes, moreover, were enforced by

the courts and considered constitutional by both courts and commentators. *E.g.*, *Coleman v. State*, 32 Ala. 581 (Ala. 1858); *State v. Allen*, 94 Ind. 441 (Ind. 1884); *State v. Callicutt*, 69 Tenn. 714 (Tenn. 1878); Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883).

In short, the historical record demonstrates that it was common for States to enact varied laws regulating children from accessing firearms to protect their safety, as well as the safety of others. The Day Care Rule—which, as explained, *supra* pp. 29-30, was promulgated for this same reason—carries on this historical tradition by preventing children from accessing firearms in a manner tailored to modern needs. Beyond sharing the same purpose, the Day Care Rule imposes burdens that are comparable to or less onerous than the relevant historical regulations, which often imposed categorical bans, *supra* pp. 30-31.

Plaintiffs contend, however, that historical tradition does not support the Day Care Rule. To begin, they take issue with Professor Cornell's discussion of state police power and colonial-era laws regulating the storage of gunpowder and firearms. AT Br. 24-25, 27. According to plaintiffs, "Defendants cannot justify the challenged bans by pointing to Illinois's general police power," *id.* at 26, or storage laws that were enacted to "prevent[ ] fire hazards," *id.* at 27. But defendants' analysis does not rest solely on these laws; as discussed, they have identified multiple regulations specific to schools, gatherings, and children, all of which demonstrate that the Day Care Rule is consistent with historical tradition. In any event, Professor Cornell's discussion of these topics—which confirms that the States

had authority under the police power to regulate the storage of firearms and ammunition in the home and elsewhere for purposes of protecting children, Doc. 57 at 10-13—is certainly relevant to assessing whether regulations requiring the safe storage of firearms and ammunition in day care homes is permissible.

Plaintiffs next argue that regulations enacted "throughout the nineteenth century and into the twentieth" are irrelevant. AT Br. 28. But this is untrue. Indeed, *Bruen* recognized that a variety of historical sources and periods may inform the historical inquiry, including the public understanding of the right to keep and bear arms in 1791, when the Second Amendment was ratified, and in 1868, when the Fourteenth Amendment was ratified, as well as the interpretation of the right in the years following both Amendments' ratification. 142 S. Ct. at 2136-38. And although the Court declined to resolve "whether courts should *primarily* rely on the prevailing understanding" of the right to keep and bear arms from 1791 or 1868, *id.* at 2138 (emphasis added), there is no question that the Court considered both relevant to the historical analysis. Consistent with this approach, several courts have considered nineteenth-century historical sources in the wake of *Bruen. E.g.*, *Frein v. Pa. State Police*, 47 F.4th 247, 254-55 (3rd Cir. 2022); *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, --- F. Supp. 3d ---, 2022 WL 3083715 at *10-*12 (N.D. Cal. Aug. 3, 2022); *United States v. Daniels*, --- F. Supp. 3d ---, 2022 WL 2654232 at *4 (S.D. Miss. July 8, 2022).

Furthermore, it is settled in this circuit that Reconstruction-era history is relevant to the historical inquiry, and *Bruen* did not undermine that precedent. As

plaintiffs recognize, this court in "*Ezell I* stated that 1868 . . . is the 'relevant historical moment' for determining the scope of the right to keep and bear arms as incorporated against the States." AT Br. 28 (quoting *Ezell I*, 651 F.3d at 702)). Plaintiffs attempt to sidestep that decision by arguing that intervening precedent "has fatally undermined that approach." *Id.* For example, they assert that the Supreme Court in *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Gamble v. United States*, 139 S. Ct. 1960 (2019), confirmed that the relevant time period is the Founding. AT Br. 28-29. But *Bruen*—which was decided after *Ramos* and *Gamble*—stated that an open question remains. 142 S. Ct. at 2138.

Plaintiffs also cite this court's reference in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), to "1791, the year the Second Amendment was ratified," as "the critical year for determining the amendment's historical meaning," *id.* at 935 (cited at AT Br. 29). But the court did not hold, as plaintiffs suggest, that the Founding is the only relevant time period; on the contrary, the court also considered nineteenth-century regulations. *Id.* at 940. In any event, this court has followed *Ezell I* and considered nineteenth-century regulations in subsequent Second Amendment cases. *E.g.*, *Ezell v. Chicago*, 846 F.3d 888, 896 (7th Cir. 2017); *Kanter v. Barr*, 919 F.3d 437, 458-62 (7th Cir. 2019) (Barrett, J., dissenting).

Finally, plaintiffs argue that the historical regulations restricting children's access to firearms "are entirely beside the point" because this case "does not involve the purchase or possession of firearms by minors, it involves the possession of operable firearms, in the home *by adults*." AT Br. 30 (emphasis in original). As the

historical record demonstrates, one way by which States protected children by preventing them from accessing firearms in an unsafe manner was by regulating the conduct of the adults who were responsible for the children's care and custody. Plaintiffs' suggestion that the safety of children cannot be secured through the Day Care Rule is incorrect.

## IV. The District Court Properly Granted Summary Judgment To Defendants On Plaintiffs' Claim That The Foster Rule Violated The Second Amendment.

Like the Day Care Rule, the Foster Rule is constitutional for multiple, independent reasons. At the threshold, the district court correctly determined that DCFS, in its capacity as legal guardian of the children in foster care, may require foster caregivers, who are government contractors, to safely store their firearms. The court also rightly determined that the Foster Rule passes constitutional muster under an ordinary Second Amendment analysis. Indeed, the unrebutted evidence that defendants set forth at summary judgment shows that foster homes are sensitive places and, alternately, the Foster Rule is consistent with a historical tradition of enacting regulations to prevent children from accessing firearms. This court should thus affirm the grant of summary judgment to defendants.

### A. It is permissible for DCFS, in its capacity as legal guardian, to require its contractors to safely store firearms in foster homes.

The district court correctly determined that DCFS, in its capacity as legal guardian, is permitted to impose reasonable standards on its contractors to ensure the safety and wellbeing of the foster children in its care, even if those conditions affect constitutional rights. SA45. This court should affirm on that basis alone.

38

In the foster care setting, DCFS is acting in its capacity as legal guardian of the children in its care, who have "a constitutional right to be placed into a safe and secure foster home." *Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 665 (7th Cir. 2005). As legal guardian, DCFS has an "affirmative duty" to safeguard that constitutional right by protecting foster children and providing for their safety. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 988 (7th Cir. 2021); *Monfils*, 165 F.3d at 517. Here, DCFS has determined that for the safety of the foster children in its care, firearms and ammunition must be safely stored in a manner inaccessible to children. As the district court noted, this decision is well within the "considerable latitude" that any guardian is afforded "to make its own reasonable decisions regarding how best to ensure the physical safety of the children in its custody." SA45.

Indeed, the Foster Rule is just one of many health and safety standards set forth by DCFS, some of which may implicate constitutional rights or impose practical burdens. For instance, foster caregivers must remove fire hazards and unsafe children's products from the residence; store tools, medication, alcohol, and other dangerous household supplies away from children; refrain from smoking in the foster home or any vehicle used to transport children; and share living arrangements with additional individuals only upon approval of DCFS. 89 Ill. Admin. Code §§ 402.8, 402.12. And to ensure compliance with these rules, their homes are subject to supervision and inspection by DCFS "at least semiannually." *Id.* §§ 402.12, 402.27.

In order to effectuate its duties to the children in its custody and care, DCFS contracts with third parties, such as foster caregivers. And as the district court rightly concluded, it is permissible for DCFS to require foster caregivers, who are providing daily support and care in the State's stead, to comply with the Foster Rule. SA45. Indeed, it is well established that the government has broad powers over contractors who carry out governmental functions, including by imposing requirements that affect their exercise of constitutional rights. *E.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006) (no First Amendment right when employees perform official duties); *NASA v. Nelson*, 562 U.S. 134, 150 (2011) (government may require background checks of contractors without violating privacy rights); *Comsys, Inc. v. Pacetti*, 893 F.3d 468, 471 (7th Cir. 2018) (government has "as much freedom to manage" contractors as employees); *Coyne-Delany Co. v. Cap. Dev. Bd. of State of Ill.*, 616 F.2d 341, 342 (7th Cir. 1980) (in government contracting, "government enjoys a broad freedom to deal with whom it chooses on such terms as it chooses"). This wide latitude stems from the government's need to direct the activities of its contractors when providing contracted services. *Comsys, Inc.*, 893 F.3d at 471.

Plaintiffs do not dispute that foster caregivers are government contractors or the general principle that the government may impose conditions on contractors. AT Br. 32-33; *Dupuy v. Samuels*, 397 F.3d 493, 514 (7th Cir. 2005) (foster care "is a contractual role created by the State"). Plaintiffs likewise do not argue that the Second Amendment is uniquely exempt from this analysis. AT Br. 32-33. Nor could they, given *Bruen*'s admonition the Second Amendment should not be "subject to an

entirely different body of rules than the other Bill of Rights guarantees." 142 S. Ct. at 2156 (internal quotations omitted). And the principles just discussed apply equally to all constitutional rights, including the Second Amendment. Instead, plaintiffs argue that the Foster Rule violates the unconstitutional conditions doctrine, which they describe broadly as precluding the State from "impos[ing] conditions which require the relinquishment of constitutional rights." AT Br. 33 (internal quotations omitted). Plaintiffs are incorrect.

To start, the relevant standard is more circumscribed than that articulated by plaintiffs. As this court has explained, the unconstitutional conditions "doctrine prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional rights." *Planned Parenthood of Indiana, Inc. v. Commissioner of Ind. State Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012). The doctrine does not, however, preclude the government from imposing all conditions on those who opt to contract with it in exchange for a benefit.

On the contrary, "conditions can lawfully be imposed on the receipt of a benefit—conditions that may include the surrender of a constitutional right, as the right to be free from unreasonable searches and seizures—provided the conditions are reasonable." *Burgess v. Lowery*, 210 F.3d 942, 947 (7th Cir. 2000); *Medlock v. Trustees of Indiana University*, 738 F.3d 867, 872 (7th Cir. 2013) (search of dorm room constitutional because student "trade[d] some privacy for a dorm room"). For example, "[c]learly it is reasonable, regardless of the doctrinal rubric, for the

government to require airline passengers to step through a metal detector even though there is no suspicion that a given passenger is carrying a weapon." *Burgess*, 201 F.3d at 847. This is so "[i]n part because the search is not intrusive, and in part because of the danger that an armed passenger poses on an airplane in flight." *Id.* Likewise, "[p]eople who work for the CIA accept that they will have less freedom of speech than if they worked at McDonald's, but since the condition is a reasonable one the restriction on their freedom of speech is not considered unconstitutional." *Id.* (citing *Snepp v. United States*, 444 U.S. 507 (1980)); *Nelson*, 562 U.S. at 150 (background checks of NASA contractors "reasonable, employment-related inquiries that further the Government's interests in managing its internal operations").

In other words, as the Sixth Circuit recently explained, there is a distinction between conditions that are "part and parcel" of the program at issue and those that "represent some out-of-place addition to an unrelated state program." *Daunt v. Benson*, 956 F.3d 396, 412 (6th Cir. 2020); *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 650 (7th Cir. 2022) ("relevant distinction is between conditions that define the limits of the government spending program— those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself").

Plaintiffs point to no evidence that DCFS promulgated the Foster Rule for any purpose other than to ensure the health and safety of the children for whom it is legally responsible. And the undisputed evidence shows that the Rule was

implemented pursuant to the State's traditional authority as legal guardian to protect the safety of foster children, and not as a gratuitous effort to intrude on the rights of foster caregivers. As the Rule 30(b)(6) witness testified, the Foster Rule was promulgated "to protect children" because "[r]educing children's access to firearms and ammunition protects against death, serious injury, and suicide." Doc. 56-2 at 26:16-20. Furthermore, DCFS made clear during the rulemaking process that the Foster Rule is necessary to "afford greater protection from injuries from firearms for children in foster care." 23 Ill. Reg. 7877 (July 16, 1999).

The Foster Rule, moreover, is consistent with national standards outlining best practices for foster homes—another indication that the Rule's requirements are "part and parcel" of the foster home program. Indeed, as explained, *supra* p. 8, the Rule was most recently amended in 2020 to comply with the 2019 National Model Foster Family Home Licensing Standards, which provide for keeping "[w]eapons and ammunition (separately) stored, locked, unloaded, and inaccessible to children." U.S. Dep't of Health and Human Servs., National Model Foster Family Home Licensing Standards, at 8 (Feb. 4, 2019), https://bit.ly/3cA1Jvq.

In addition to aligning with national standards, the Foster Rule is supported by a large body of empirical research detailed in the Miller-Azrael report, which plaintiffs did not controvert. Based on those studies, Drs. Miller and Azrael concluded "that fewer children attending . . . foster homes in Illinois will die or be injured by gunfire if the [Foster Rule is] in effect, compared to what would be the case if these regulations were not in place or relaxed." Doc. 56-16 at 5.

The unrebutted evidence shows, moreover, that the Foster Rule's requirements are effective in preventing the tragic events that can otherwise occur when children are able to access firearms. Indeed, as plaintiffs pointed out before the district court, no children in foster homes died by firearm in a foster home during Fiscal Years 2017, 2018, or 2019. Doc. 63 at 19-20. And, as discussed, *supra* pp. 14-15, 43, children in households that do not engage in safe storage practices are more likely to die or be injured by firearms, whether by suicide, accident, or homicide.

Finally, the condition at issue here—which requires only that foster caregivers safely store firearms and ammunition so that they are inaccessible to children—is reasonable. 89 Ill. Admin. Code § 402.8(o). Foster caregivers are not prohibited from owning firearms or ammunition, nor are they prevented from using them in self-defense if needed. *Id.*; *Burgess*, 210 F.3d at 947 ("conditioning is a lesser infringement than prohibiting").

As support for their position, plaintiffs cite three Supreme Court cases, but none is controlling. The first, *Frost v. Railroad Commission of California*, 271 U.S. 583 (1926), involved a state licensing law that essentially required private carriers to assume the duties and burdens of a public carrier to use the state highways. *Id.* at 590-91. The Court invalidated these requirements because the applicable statutory scheme was "in no real sense a regulation of the use of the public highways." *Id.* at 591. Instead, the requirements were imposed to "protect the business of those who are common carriers . . . by controlling competitive

conditions." *Id.* And States may not enact unconstitutional legislation "under the guise" of a valid regulatory purpose. *Id.* at 593. As explained, the Foster Rule does not run afoul of that principle.

Plaintiffs also incorrectly argue that the district court's decision is in conflict with *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), which addressed whether, consistent with the First Amendment, Philadelphia could decide to "renew its foster care contract with Catholic Social Services only if the agency agrees to certify same-sex couples." *Id.* at 1874. According to plaintiffs, the district court failed to explain how its decision could be squared with *Fulton*, which struck down the challenged licensing requirement as unconstitutional. AT Br. 34. But while Philadelphia argued that "a more deferential approach" applies "in the contracting context," the Court found "no need to resolve that narrow issue in this case" because the system employed was flawed "[n]o matter the level of deference" extended. *Id.* at 1878. The district court's decision to take into account the foster caregivers' status as government contractors is thus not at odds with *Fulton*. In any event, *Fulton* is inapposite for the additional reason that it did not turn on Philadelphia acting in its capacity as legal guardian or involve regulations directly impacting the physical safety of children in its care. *Id.* at 1881.

Plaintiffs' third case, *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013), is inapposite because it "involve[s] a special application of [the unconstitutional conditions] doctrine that protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-

use permits." *Id.* at 604 (cleaned up).  Beyond that distinction, however, *Koontz* was concerned with "the misuse of power," and not with the notion of conditions generally.  *Id.* at 599.  Again, there is no evidence that DCFS promulgated the Foster Rule to coerce caregivers into surrendering their constitutional rights rather than to protect children for whom it is legally responsible.

All told, while plaintiffs may be entitled to store their firearms however they see fit when residing in their homes as wholly private citizens, the Second Amendment does not allow them to exempt themselves from the Foster Rule when they are serving as foster caregivers.  *E.g.*, *Garcetti*, 547 U.S. at 421-22 (distinction between liberties enjoyed "as a private citizen" and those that affect government operations).  Otherwise, foster caregivers could avoid any foster care rule that might conflict with their constitutional rights as private citizens.  For example, a foster family could assert that the regulation allowing DCFS caseworkers to inspect a foster home at any time interferes with their rights under the Fourth Amendment, 89 Ill. Admin. Code § 402.27, or claim that substantive due process should allow a registered sex offender to move into the household without a background check, *id.* § 402.12(b).  Like these requirements, the Foster Rule is a modest condition that the State implements under its role as legal guardian for the purpose of protecting the safety of children in DCFS's care.  Accordingly, it does not violate the unconstitutional conditions doctrine.

## B.    In any event, the Foster Rule comports with the Second Amendment because foster homes are sensitive places.

Alternatively, affirmance is warranted under the sensitive places doctrine because foster homes are analogous to schools in many important respects.[6]  For example, both schools and foster homes revolve around the care and support of children in facilities that are licensed and overseen by the State, *supra* pp. 6-7, 27.  Furthermore, when children attend school or are placed in a foster home, they are entrusted into the care of licensed professionals who are statutorily charged with protecting their safety and wellbeing, *supra* pp. 6-7, 27, 39.  Indeed, when children attend school, the State assumes an *in loco parentis* obligation to keep them safe, 105 ILCS 5/24-24.  And that obligation is even stronger in the foster care context, where foster caregivers are responsible for the safekeeping of children in the care and custody of the State, *see supra* pp. 39-40.

As with day care homes, foster homes are also similar to schools under the metrics highlighted in the historical tradition passage in *Bruen*, to the extent those metrics are part of the sensitive places analysis.  142 S. Ct. at 2132.  Indeed, as detailed above, *supra* pp. 28-29, States and localities enacted prohibitions on

---

[6]  As plaintiffs note, neither defendants nor the district court engaged in a sensitive places analysis for foster homes under the prior two-step framework.  AT Br. 19 n.2. To the extent this argument was forfeited, this court should excuse that forfeiture in these exceptional circumstances, where, as here, an intervening Supreme Court decision clarified the appropriate legal standard and where the forfeited argument "is founded on concerns broader than those of the parties."  *Bourgeois v. Watson*, 977 F.3d 620, 631 (7th Cir. 2020).

firearms in schools to protect the safety of children. The record likewise makes clear that the Foster Rule was promulgated to protect the safety of children, and that it is an effective measure, *supra* pp. 43-44. Finally, for the same reasons explained above, *supra* pp. 44, the safe storage requirements placed on foster licensees, 89 Ill. Admin. Code § 402.8(o), are less burdensome than the outright prohibition on firearms imposed on individuals subject to the historical prohibitions on firearms in schools, *Bruen*, 142 S. Ct. at 2133.

Beyond these similarities, there is additional historical evidence supporting this analogy. Specifically, the historical record shows that the "house of refuge" system—which was the historical precursor to the foster care system—was considered a school. Indeed, as historians have noted, the foster care system is rooted in "the historical practice" of placing children in houses of refuge and other similar institutions. *E.g.*, Judge Ernestine Steward Gray, *The Adoption and Safe Families Act of 1997: Confronting an American Tragedy*, 46 La. B.J. 477, 477 (1999); Sanford J. Fox, *Juvenile Justice Reform: An Historical Perspective*, 22 Stan. L. Rev. 1187, 1187 (1970). Like the foster care system today, *supra* pp. 39, the State acted as "*parens patriae*" with a "right of parental control" over wards in their care, *Ex Parte Crouse*, 4 Whart. 9, 11 (Pa. 1839). And these institutions, which served educational and caregiving purposes, were treated as schools. *Id.* ("House of Refuge is not a prison, but a school"); *Roth v. House of Refuge*, 31 Md. 329, 335 (1869) (House of Refuge is a "school"); *Prescott v. State*, 19 Ohio St. 184, 188 (1869) (institution is a "school").

This history, moreover, highlights that houses of refuge and foster homes share the same characteristics relevant to a sensitive places analysis—just like with other locations that are considered sensitive places because of the government activities that take place there (*e.g.*, polling sites). *Bruen*, 142 S. Ct. at 2133. Where the State would have placed children in its care and custody in a house of refuge in the nineteenth century, it now contracts with caregivers to place children in a home environment. But the nature of the activities taking place in both settings is the same, regardless of whether such activities occur in state buildings or state-licensed homes. For these reasons, too, this court should conclude that foster homes are sensitive places.

C. **In the further alternative, the Foster Rule is consistent with the historical tradition of firearms regulation, and thus does not violate the Second Amendment.**

Finally, the Foster Rule is constitutional because it is consistent with historical tradition. As explained above, *supra* Section III.B., States and localities enacted a number of laws in the eighteenth and nineteenth centuries to protect "the safety and well-being" of children, including prohibitions on firearms in gathering places such as schools, restrictions on children accessing firearms, and laws imposing liability and other requirements on guardians of children who improperly used firearms. Doc. 57 at 19-20. And, as relevant in the foster context, certain of these restrictions were extended to apprentices, *e.g.*, *id.* at 17; Ordinances of the City of New York § IV (1763), who, in Colonial America, were treated as wards under the care and custody of a legal guardian, *e.g.*, Fox, 22 Stan. L. Rev. at 1209-10

(modern "use of foster homes had roots in colonial apprenticeship practices");
*Warner v. Smith*, 8 Conn. 14 (Conn. 1830) (guardian bound to "stand[ ] *in loco parentis*").

Because the Foster Rule, like the historical regulations discussed above, was promulgated to protect the safety of children in the State's care by preventing access to firearms, and imposes burdens that are less onerous than the aforementioned laws, *supra* pp. 47-48, it aligns with this historical tradition and may be affirmed on that basis.

## V.    In Any Event, The Millers Waived Their Second Amendment Rights.

Finally, even if this court concludes that the DCFS Rules infringed upon plaintiffs' Second Amendment rights, affirmance is still warranted because the Millers waived their rights to possess and store their firearms unencumbered by the DCFS Rules when they obtained day care home and foster licenses.  It is well established that constitutional rights can be waived in many contexts, including by contract or as part of a licensing process.  *D.H. Overmyer Co. Inc., of Ohio v. Frick Co.*, 405 U.S. 174, 187 (1972); *Medlock*, 738 F.3d at 872.  As this court has explained, a waiver is valid and enforceable so long as it is knowing and voluntary. *Domka v. Portage Cnty.*, 523 F.3d 776, 781 (7th Cir. 2008).  "A waiver is voluntary in the absence of coercion . . . and is knowing if made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *United States v. Krilich*, 159 F.3d 1020, 1026 (7th Cir. 1998) (cleaned up).  And here, the undisputed evidence shows that the Millers knowingly and

voluntarily waived their Second Amendment rights when they became licensed foster caregivers, and that Jennifer did the same when she obtained a day care home license.

As part of the process of entering into this contractual relationship with DCFS in 2016, the Millers signed application materials confirming that they understood the standards for foster homes. Doc. 56-1 at 6. Additionally, in 2016, the Millers signed the "Acknowledgement of Compliance, Part 402, Licensing Standards for Foster Family Homes," and the "Foster Family Firearms Agreement," both of which explicitly restated the requirements for firearm storage in their home. *Id.* at 7-8. Moreover, the Millers are familiar with their Second Amendment rights, and have long been FOID card and concealed carry license holders. In short, the Millers understood "both the nature of the right being abandoned and the consequences of the decision to abandon it." *Krilich*, 159 F.3d at 1026.

The same is true for Jennifer's day care home license. As part of the application process in 2017, Jennifer signed an application form containing a certification that she had had read, was familiar, and would comply with the day care home licensing standards. Doc. 56-1 at 14. Jennifer also signed a "Firearms Agreement" in 2019, certifying that she was familiar with the relevant firearm and ammunition storage rules, and that she was in compliance with those rules. *Id.* at 16. Her waiver, too, was thus knowing and voluntary.

The district court incorrectly concluded, however, that defendants were not entitled to summary judgment on the basis of waiver. With respect to foster care,

the court found a genuine dispute of material fact as to "whether the Millers understood themselves to be waiving their rights under the Second Amendment when they applied to be foster parents in 2016." SA22. But the court did not cite any specific evidence showing such a lack of understanding. Instead, it reasoned that a genuine material fact existed because the Millers were not represented by counsel, there was no negotiation between the parties as to the terms, and there was a lack of bargaining equality. SA22. But these circumstances do not create a genuine issue of material fact because they do not show that the Millers lacked knowledge of the waiver that they signed. And there is no suggestion in the record that the terms of the forms signed by the Millers were unclear or coercive, or that the Millers were forced to apply for licensure. In fact, this court has upheld waivers in similar contexts. *E.g.*, *Medlock*, 738 F.3d at 869 (student waived constitutional rights when, as a condition of living in a university dormitory, he "agree[d] to comply with a long list of rules, one of which was that he allow health and safety inspections of his dorm room").

With respect to day care, the court concluded that the form Jennifer signed in 2017 was not sufficiently specific to constitute a waiver and, alternatively, that a genuine dispute of material fact existed because the Millers testified that they "did not understand that the Day Care Home Rule did not allow them to store handguns in their home during day care hours until roughly a year after they received their Day Care Home License, when a DCFS employee informed them that they were in violation of the Rules." *Id.* (citing Doc. 56-4 at 223-25). The court further concluded

that the "Firearms Agreement" in 2019 could not constitute a valid waiver because it was completed after the lawsuit was filed. SA21.

But for the same reasons just discussed, a person may waive their rights by agreeing to comply with a list of rules, as Jennifer did by completing the 2017 application materials. And with respect to the court's alternative finding, the cited excerpt is pulled from Darin's testimony; there is no such testimony from Jennifer, who signed the documents and possesses the license. Finally, the lawsuit's timing is immaterial to the waiver analysis, since the question at issue is whether Jennifer waived her Second Amendment rights, and not her right to bring suit.

On appeal, however, plaintiffs suggest that the Miller's waiver should be invalidated under the unconstitutional conditions doctrine. AT Br. 32. But as explained above, *supra* Section IV.A., that doctrine does not prevent the government from imposing conditions on receipt of a benefit, where the condition is "part and parcel" of the program at issue, *Daunt*, 956 F.3d at 412; *see also, e.g.*, *Hall v. Sweet*, 666 F. App'x 469, 476-77 (6th Cir. 2016) (no Fourth Amendment violation where day care home operator consented to searches of home as condition of licensure). And here, as discussed, *supra* pp. 29, 43, the DCFS Rules further a critical goal of the day care home and foster care programs: protecting the safety of children. In sum, the undisputed evidence in the record shows that the Millers waived their right to store and possess firearms unencumbered by the DCFS Rules.

## CONCLUSION

For these reasons, Defendants-Appellees request that this Court affirm the judgment of the district court.

Dated October 6, 2022

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendants-Appellees

/s/ Sarah A. Hunger
**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word, in 12-point Century Schoolbook font, and complies with Federal Rule of Appellate Procedure 32(a)(7)(A) in that the brief is 13,967 words.

/s/ Sarah A. Hunger
**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on October 6, 2022, I electronically filed the foregoing

Brief of Defendants-Appellees with the Clerk of the Court for the United States

Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify

that all participants in the case are registered CM/ECF users and that service will

be accomplished by the CM/ECF system.

/s/ Sarah A. Hunger
**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov