**22-1482**

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

❖

JENNIFER J. MILLER, *et al.*,

*Plaintiffs-Appellants,*

—v.—

MARC D. SMITH, in his official capacity as Acting Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
NO. 3:18:CV-03085-SEM-TSH
HONORABLE SUE E. MYERSCOUGH

## BRIEF FOR *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

JANET CARTER
WILLIAM J. TAYLOR, JR.
KARI L. STILL
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, New York 10017
(646) 324-8174
jcarter@everytown.org

*Counsel for Amicus Curiae
  Everytown for Gun Safety*

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock and hence no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

STATEMENT OF INTEREST ...................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 2

ARGUMENT ............................................................................................ 4

    I.    The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ............................................................................ 4

    II.   This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as "Outliers" ........................................ 12

    III.  Places May Be Sensitive Because of the Vulnerable People Found There ...................................................................... 14

CONCLUSION ...................................................................................... 17

# TABLE OF AUTHORITIES

## *Cases*

*Abington Sch. Dist. v. Schempp,*
  374 U.S. 203 (1963) ..................................................................................16

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,*
  910 F.3d 106 (3d Cir. 2018) ........................................................................1

*Davenport v. Wash. Educ. Ass'n,*
  551 U.S. 177 (2007) ..................................................................................14

*DiGiacinto v. Rector & Visitors of George Mason Univ.,*
  704 S.E.2d 365 (Va. 2011) ........................................................................15

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................................................3, 11, 13

*Doe ex rel. Doe v. Elmbrook Sch. Dist.,*
  687 F.3d 840 (7th Cir. 2012) (en banc) ....................................................17

*Drummond v. Robinson Township,*
  9 F.4th 217 (3d Cir. 2021) ..........................................................................5

*Espinoza v. Mont. Dep't of Revenue,*
  140 S. Ct. 2246 (2020) ..............................................................................16

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ...................................................................5, 9

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015) ....................................................................14

*Gamble v. United States,*
  139 S. Ct. 1960 (2019) ................................................................................9

*Gould v. Morgan,*
  907 F.3d 659 (1st Cir. 2018) ......................................................................5

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ...............................................................5, 9, 13, 15

*Moore v. Madigan,*
  702 F.3d 933 (7th Cir. 2012) ......................................................................5

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022)............................................................................passim

*Ramos v. Louisiana*,
140 S. Ct. 1390 (2020)............................................................................9, 10

*Rehaif v. United States*,
139 S. Ct. 2191 (2019)...................................................................................2

*Rupp v. Becerra*,
401 F. Supp. 3d 978 (C.D. Cal. 2019)..........................................................2

*Teter v. Connors*,
460 F. Supp. 3d 989 (D. Haw. 2020) ...........................................................2

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019)...............................................................4, 14

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ........................................................................5

## Statutes

1870 Tex. Gen. Laws 63, ch. 46, § 1 ...........................................................15

## Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223,
243 (1998).......................................................................................................8

Am. Acad. Pediatrics, *Your Child Is on the Move: Reduce the Risk of Gun
Injury* (2021), https://doi.org/10.1542/peo_document345.........................16

Brief for Independent Institute as Amicus Curiae, *New York State Rifle &
Pistol Ass'n v. Bruen*, No. 20-843 ........................................................10, 13

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*,
13 Charleston L. Rev. 205 (2018)........................................................10, 13

Deborah Azrael et al., *Firearm Storage in Gun-Owning Households with
Children: Results of a 2015 National Survey*, 95 J. Urb. Health 295 (2018).........16

Joseph Blocher & Darrell A.H. Miller, *The Positive Second Amendment* (2018) ......15

Kate Masters & Michael Hirsh, *I've Been a Pediatric Surgeon for 30 Years.
I Know Firsthand What Bullets Do to Kids*, The Trace (Aug. 1, 2016),
https://www.thetrace.org/2016/08/pediatric-surgeon-what-bullets-do-to-kids/ .....16

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ...........8, 9

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ...................................................................................7

Lily A. Brown, *Suicide in Foster Care: A High-Priority Safety Concern*, 15 Persps. on Psych. Sci. 665 (2020) ................................................................16

Michael C. Monuteaux et al., *Association of Increased Safe Household Firearm Storage with Firearm Suicide and Unintentional Death Among U.S. Youths*, 173 J. Am. Med. Ass'n Pediatrics 657 (2019) ............................................16

*Nat'l Inst. of Child Health & Dev.*, Preventing Gun Violence, the Leading Cause of Childhood Death (July 5, 2022), https://www.nichd.nih.gov/about/org/od/directors_corner/prev_updates/gun-violence-July2022 .................................................................................16

Richard Franklin Bensel, *The American Ballot Box in the Mid-Nineteenth Century* 9 (2004)...........................................................................................17

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n*, No. 20-843 (U.S.)...........................................................................................11

U.S. Statement of Interest, *Angelo v. District of Columbia*, No. 1:22-cv-01878 (D.D.C.)...............................................................................................15

## STATEMENT OF INTEREST

Amicus curiae Everytown for Gun Safety ("Everytown") is the nation's largest gun violence prevention organization, with nearly ten million supporters across the country, including over 370,000 in Illinois. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 24 Illinois cities and localities are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 50 amicus briefs in Second Amendment and other firearms cases, including in this Court, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *White v. Illinois State Police*, No. 20-2842 (7th Cir.); *Kanter v. Barr*, No. 18-1478 (7th Cir.); *see also, e.g.*, *Teter v. Shikada*, No. 20-15948 (9th Cir.). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018);

*Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants-Appellees (the "State") have demonstrated that Illinois's restrictions on firearms in home day cares (the "Day Care Rule") and in foster homes (the "Foster Rule") are analogous to longstanding firearms prohibitions in schools—and, for that reason alone, are constitutional under the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). *See* State's Br. at 22-23, 26-33, 47-49. Alternatively, as the State also explains, the Court may analyze the entire historical record here, which further demonstrates the constitutionality of the Day Care Rule and the Foster Rule. *See id.* at 33-38, 49-50.

The Supreme Court confirmed in *Bruen* that certain locations—including schools, government buildings, and polling places—were historically deemed "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133; *see also id.* at 2162 (Kavanaugh, J., concurring). Accordingly, "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of

---

[1] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 2133. In other words, courts need not review the historical record *de novo* when confronting restrictions in locations that are analogous to those historical sensitive places. Here, because day cares and foster homes are both analogous to schools, this Court can and should affirm the judgment of the district court without further canvassing the historical record.[2]

Still, if this Court chooses to undertake a full historical analysis in assessing Plaintiffs' Second Amendment challenges, Everytown offers three additional points to guide that analysis. *First*, in assessing whether a law is part of "the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, the Court should center its analysis on the public understanding of the right in 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). *Second*, *Bruen*'s sensitive places analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of

---

[2] There are at least two additional, dispositive grounds on which this Court can affirm the judgment below without further historical analysis. First, the Foster Rule is independently permissible because the State, "in its capacity as legal guardian of the children in foster care," may impose reasonable standards on the foster caregivers with whom it contracts. State's Br. at 38; *see id.* at 38-46. And, second, both provisions further pass constitutional muster because Plaintiffs knowingly and voluntarily waived their rights to possess and store firearms in any manner they choose when they became licensed home day care providers and foster parents. *See id.* at 50-53.

3

firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. Although that point is not directly implicated here, given the State's robust and extensive historical record, we highlight it in case this Court wishes to give guidance to district courts for future Second Amendment cases. *Third*, in considering the historical basis for designating home day cares and foster homes as sensitive places, this Court should acknowledge that sensitive places are often characterized by the nature of the people found there, *see, e.g.*, *United States v. Class*, 930 F.3d 460, 463-66 (D.C. Cir. 2019)—and should uphold the Day Care Rule and the Foster Rule because of the vulnerable children present in both of these locations.

## ARGUMENT

### I.  The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

If the Court proceeds to a full historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

Several circuits, including this Court, reached that conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[3] *See Ezell v. City of Chicago*, 651 F.3d 684,

---

[3] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analysis of Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically

702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).[4]

---

understood; and, if so, a means-ends scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

[4] As the State observes, *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), referred to 1791, but did not hold that 1791 is the only relevant time period for historical inquiry. *See* State's Br. at 37. Moreover, *Moore* did not acknowledge the implications for originalism of the fact that the Second Amendment did not apply against the states until the 1868 ratification of the Fourteenth Amendment (which is mentioned nowhere in the opinion). Instead, *Moore* cited a passage in *McDonald* saying that the standards against the state and federal governments should be the same. *See* 702 F.3d at 935 (citing *McDonald v. City of Chicago*, 561 U.S. 742, 765-66, 766 n.14 (2010)). But that merely flags the issue that *Bruen* acknowledged, *see* 142 S. Ct. at 2137, before leaving open the question whether the 1868 or 1791 understanding should control, *see* 142 S. Ct. at 2138. Accordingly, *Moore*'s observation has no remaining force after *Bruen*, whereas *Ezell*'s observation remains a faithful application of originalist principles, as well as being the one this Court followed in pre-*Bruen* Second Amendment cases. *See* State's Br. at 37.

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because the public understanding "for all relevant purposes" in the case before it was the same in both 1791 and 1868). Moreover, *Bruen* concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the State's brief, this Court can uphold the Day Care Rule and the Foster Rule under a historical analysis without resolving whether it should focus that analysis on the period around 1791 or the period around 1868. *See, e.g.*, State's Br. at 33-35 (Day Care Rule), 49-50 (Foster Rule).[5] But if this Court prefers to settle the issue the Supreme Court left open now, it should conclude that 1868 is the correct focus.

To begin with, in a case involving a state law, a focus on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the

---

[5] Even if the Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's evidence), it should rely on 19th-century (and even 20th-century) history to clarify that meaning. *See* State's Br. at 36-37; *infra* pp. 11-12.

states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government.").

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the

majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[6] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the

---

[6] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and the spirit of the amendment of 1866, not the Bill of 1789.... [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 142 S. Ct. at 2138. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against the states does not make sense in light of the lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why this Court, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.[7]

---

[7] Contrary to Plaintiffs' contention (at 28-29), as the State explains in its brief (at 36-37), subsequent cases have not undermined *Ezell*'s focus on 1868. Plaintiffs argue that *Gamble v. United States*, 139 S. Ct. 1960 (2019), requires this Court to discount the wealth of historical laws from the second half of the 19th century. *See* Appellants' Br. at 28. But *Bruen* confirms that *Gamble* has no such effect: *Bruen* acknowledged *Gamble* and still expressly left open the question whether 1868 or 1791 is the proper focus. *See* 142 S. Ct. at 2137-38. Similarly, *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), preceded (and thus must be read in light of) *Bruen*—and, in any event, *Ramos*'s assertion that the "incorporated provisions of the Bill of Rights

Plaintiffs' argument that "the relevant time period is the Founding,"
Appellants' Br. at 28, is therefore unfounded. Such a position is also inconsistent
with the passage in *Bruen* instructing the lower courts on historical methodology
through the example of sensitive places restrictions. There, the Court indicated that
restrictions on guns in legislative assemblies, polling places, and courthouses found
in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142
S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that
the 18th century was the only relevant period. Notably, in the pages of the article
and brief the Court cited for that proposition, *see id.*, all the 19th-century laws
restricting guns in any of the three locations the Court listed were from the *late*
19th century.[8]

Finally, further confirmation that 1868 is the correct focus appears in the
*Bruen* oral argument, where the following exchange took place between Justice
Thomas and former Solicitor General Paul Clement as counsel for the NRA's New
York affiliate:

> JUSTICE THOMAS: … [Y]ou mentioned the founding and you
> mentioned post-Reconstruction. But, if we are to analyze this based

---

bear the same content when asserted against States as they do when asserted
against the federal government," *id.* at 1397; *see* Appellants' Br. at 28, supports the
view that 1868 is the correct focus for all levels of government. *See also supra* note 4
(explaining why Plaintiffs' reliance on *Moore v. Madigan* is misplaced).

[8] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*,
13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886
Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law);
Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen*, 142 S. Ct. 2111 (No. 20-843)
(disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee,
1870 Texas, and 1890 Oklahoma laws that prohibited guns in sensitive places).

upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8, *Bruen*, 142 S. Ct. 2111 (No. 20-843).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison).

Here, state laws from the second half of the 19th century and early 20th century establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption and demonstrate the constitutionality of

11

Illinois's laws. *See* State's Br. at 12-13, 28-29, 32-34, 48-49.[9] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, it should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like the Day Care Rule and the Foster Rule.

## II.     This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as "Outliers"

Challengers in recent Second Amendment cases have sought to dismiss historical regulations as "outliers" insufficient to establish a historical tradition under *Bruen*. *See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers"). No such argument is remotely tenable in this case, given the State's robust and extensive record of historical laws. *See, e.g.*, District Court Docket ("Doc.") 57 at 19-22 (expert report); Doc. 57-5 (appendix of state and local laws and regulations related to minors); State's Br. at 12-13, 28-29, 32-34, 48-49; Doc. 56 at 42-44, 43 n.10 (State's summary judgment brief). But to the extent this Court might wish to address the issue to guide district courts' Second Amendment analysis in future cases, it should observe that a small number of laws can establish

---

[9] To be clear, whether laws precisely like the challenged provisions of Illinois's law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that in applying analogical reasoning, the government need only identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations—legislative assemblies, polling places, and courthouses—were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id*. But the sources the Court cited for the historical record justifying restrictions in those three locations identified only two laws naming legislative assemblies and two naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. at 11-12. Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[10]

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states

---

[10] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given the Court's discussion of sensitive places.

historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As this Court explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

## III.   Places May Be Sensitive Because of the Vulnerable People Found There

In *United States v. Class*, the D.C. Circuit observed that one of the reasons why a place may be "'sensitive' for purposes of the Second Amendment" under *Heller* is "because of 'the people found there.'" 930 F.3d 460, 465 (D.C. Cir. 2019)

14

(citation omitted). History and common sense establish that when a location frequently serves members of a vulnerable population—particularly children—guns may be prohibited in that location. *See, e.g.*, *McDonald*, 561 U.S. at 786 (plurality opinion) ("laws forbidding the carrying of firearms in sensitive places such as schools" are among the "longstanding regulatory measures" on which *Heller* did not cast doubt); 1870 Tex. Gen. Laws 63, ch. 46, § 1 (prohibiting guns in "any school room or other place where persons are assembled for educational … purposes"); Joseph Blocher & Darrell A.H. Miller, *The Positive Second Amendment* 106 (2018) (describing "a school" as "the model sensitive place" in part due to "the presence of children"); *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (upholding restriction on guns at George Mason University under Virginia Constitution; observing that many children use the school's buildings (freshmen under age 18, preschoolers at a child study center, and summer camp attendees) and concluding that GMU is a "sensitive place"). The U.S. Department of Justice recognized this aspect of sensitive places doctrine in a recent Statement of Interest, where it argued in support of D.C.'s prohibition on firearms on the Metro transit system in part "because vulnerable individuals, like children, frequently use the system." U.S. Statement of Interest at 8, *Angelo v. District of Columbia*, No. 1:22-cv-01878 (D.D.C. Sept. 30, 2022), Dkt. 27.

Children are especially vulnerable to gun violence, as victims of intentional violent acts from which they are more likely to suffer grave injury if struck by bullets, from suicide (for which foster children in particular are at elevated risk),

and also through accidents occasioned by adult carelessness (in leaving a firearm accessible) combined with child inquisitiveness. *See, e.g.*, Kate Masters & Michael Hirsh, *I've Been a Pediatric Surgeon for 30 Years. I Know Firsthand What Bullets Do to Kids*, The Trace (Aug. 1, 2016), https://www.thetrace.org/2016/08/pediatric-surgeon-what-bullets-do-to-kids/; Lily A. Brown, *Suicide in Foster Care: A High-Priority Safety Concern*, 15 Persps. on Psych. Sci. 665 (2020); Michael C. Monuteaux et al., *Association of Increased Safe Household Firearm Storage with Firearm Suicide and Unintentional Death Among U.S. Youths*, 173 J. Am. Med. Ass'n Pediatrics 657 (2019); Deborah Azrael et al., *Firearm Storage in Gun-Owning Households with Children: Results of a 2015 National Survey*, 95 J. Urb. Health 295 (2018); Am. Acad. Pediatrics, *Your Child Is on the Move: Reduce the Risk of Gun Injury* (2021), https://doi.org/10.1542/peo_document345.[11] The Day Care Rule and the Foster Rule are both directed to protecting this vulnerable population and should be upheld as permissible regulations of sensitive places for that reason alone.[12]

---

[11] *See also Nat'l Inst. of Child Health & Dev.*, *Preventing Gun Violence, the Leading Cause of Childhood Death* (July 5, 2022), https://www.nichd.nih.gov/about/org/od/directors_corner/prev_updates/gun-violence-July2022 ("In 2020, firearm-related injuries surpassed motor vehicle crashes to become the leading cause of death among people ages 1 to 19 years in the United States.").

[12] To the extent that Plaintiffs or their amici argue that sensitive places should be limited to locations on public (not private) property, they are mistaken. Two quintessential sensitive places—schools and polling places—encompass private property, especially as a historical matter. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258-59 (2020) (describing government support for private religious schools from the founding era to the present day); *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 238 & n.7 (1963) (Brennan, J., concurring) ("Education, as

## CONCLUSION

This Court should affirm the district court's grant of summary judgment in favor of the State.

Respectfully submitted,

October 13, 2022

/s/ Janet Carter
Janet Carter
William J. Taylor, Jr.
Kari L. Still
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017

*Counsel for amicus curiae*
*Everytown for Gun Safety*

---

the Framers knew it, was in the main confined to private schools."); *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 860 (7th Cir. 2012) (en banc) (Hamilton, J., concurring) (recognizing that voting in American elections, both historically and today, takes place in "all sorts of public and *private* buildings," including "churches, … synagogues, mosques, Masonic temples, skating rinks, funeral homes, bakeries, and so on" (emphasis added)); Richard Franklin Bensel, *The American Ballot Box in the Mid-Nineteenth Century* 9 (2004) ("In the nineteenth century, there were far fewer government buildings than there are today, and for that reason, most elections were held in privately owned structures…. [I]n the country, where most of the people in the United States lived, voting was conducted in barns, private homes, country stores, and churches ….").

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) as modified by Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word, in 12-point Century Schoolbook font, and complies with Circuit Rule 29 in that this brief contains 4,892 words, excluding the portions exempted by Fed. R. App. P. 32(f).

/s/ Janet Carter
Janet Carter
*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2022, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Janet Carter
Janet Carter
*Counsel for amicus curiae*
*Everytown for Gun Safety*